Alright, last piece for today. Alright, let's do this. May it please the Court, Rosemary Rivas on behalf of the plaintiffs and appellants. Would you like to reserve any time for rebuttal? Yes, Your Honor. Three minutes, please. Alright, go ahead, please. I'm first going to talk about the UCL unfair claim followed by the omission claim. I'm going to focus on the alleged misconduct from June 2017 forward because that's the found stated a claim for unfair business practices. In June 2017, Intel was informed by Google researchers that its CPUs were subject to exploits called Spectre and Meltdown, and that these exploits could be used by cyber criminals to steal confidential information. What did Intel do after that? Intel continued to ship and sell CPUs that were subject to those exploits, and it even went further than that. It launched a new generation of CPUs that it knew were subject to the exploits. You know, I think that, I don't know, I'm certainly aware of the facts. I think the real question here in what this case turns on is whether these, and because we know it was an issue. Correct. So, but the real question is was this central, excuse me, to the processor's function? If it was, you lose. I mean, you win. If it wasn't, you lose. And that's basically, if you boil everything down, what we come to. So why don't you address that? Yes, Your Honor, and that's a good question. And I don't think we lose if the court finds that there was no defect that was relating to the central functionality. So you think the district court's analysis in that regard was wrong? On the omission claim, yes. But I think the central functionality defect or test doesn't apply at all for the unfair business practices claim. Okay. So there are two separate claims that need to be analyzed differently. All right. Well? And I'll address Your Honor's question, were the defects related to the product's central functionality? And I'll state, this Court's decision in Hodgsdon requires that plaintiffs plead a physical defect and one that's central to the function of the product. Plaintiffs met that. Plaintiffs have alleged a defect in the CPUs. CPUs are hardware. That's the physical defect. And they also allege in the complaint, maintaining the security of confidential information is a fundamental function of all CPUs. That's at page 305 of the excerpts of record. So you agree that Hodgsdon is the test? It's not Lemandry? Well, there's an element of Lemandry in that the omission has to be material. But yes, I agree, Your Honor. Okay. Because I thought in your brief you might be arguing that Lemandry alone should be the test instead of the combination of Hodgsdon and Lemandry. But that's not your position, then. It's Hodgsdon, which incorporates Lemandry. Is that right? That's correct. Some courts have just applied Lemandry, Your Honor. But here in the Ninth Circuit, yes, it's the Hodgsdon test that should be applied. And I'll explain why these defects are central to the function of the CPUs. When the public disclosure came out, Intel told people, before you use these CPUs, it is imperative that you download the patches. For CPUs that it did not develop patches for, it said, do not use your devices with these specific CPUs anymore. Get new devices. So if Intel and industry participants are telling the public that, in my view, it's clear that these defects go to the central function of the CPUs. Well, I guess it depends upon how you define central function. I mean, the CPUs worked. They did the job that they were designed to do. And apparently, they did it fairly well. AMD, apparently, their main U.S. competitor, had a similar problem. The question is rather, were they vulnerable to hacking or vulnerable to some other sort of intrusion? And have we come to the point where that becomes an essential function of a processor, that it can't be susceptible to threats? I believe the standard is that it shouldn't be susceptible to known threats. You see these, I mean, anybody who has an Apple iPhone or even an Android phone knows that they're getting patches and updates constantly because hackers are always coming up with new ways to break into phones or break into computers or whatever. I mean, it seems like every other day, somebody's getting some sort of update. Does that mean that, and many of them say, don't, you know, this has to be immediately done, don't use your device unless you do this. Does that mean the devices aren't performing, in your view, their central function? If it was a known problem, as in this case, when Intel was informed in June 2017 about these exploits, and these exploits had already been, there were malware in the wild showing that these exploits could happen, and Intel continues to sell new CPUs and launch them into the product, into the market, and knowing that these are going to become unusable if people don't download the patches, and if they do download the patches, they're going to lose performance. Can I ask you a question? I don't recall seeing that in your briefs. Where do you argue that Intel said, don't use the patches, buy a new device? Can you point me to a specific page? Because I thought your argument is that the patches cured the problem, but then slowed down performance, and that was your argument. Isn't that, that's been your argument in this litigation, so this seems like a brand new argument that I'm hearing today, that Intel's patches were inadequate and didn't work. Point me to a page number, if you can, to this new argument, and I'm just surprised that I haven't heard this before. Where is it? Can you just point me to the page? Perhaps I missed it. We're not arguing that the patches did not work, Your Honor. What we're saying is— But that's, you just argued that proves central functionality, is that Intel said, don't use the patches, get a new device. Isn't that what you just argued a couple minutes ago? No, Your Honor. I apologize. I probably didn't say it well. What I said was that Intel did not develop patches for every CPU. For example, there was a chip that was— Where is that in your briefing? Where is that? And I guess I'm also curious, you know, some of the claims have been sort of evolving and morphing, and so perhaps this is a new argument as well. But your argument seems to be based on, and it's been a shifting set of allegations, that Intel should have informed consumers right away as soon as it was alerted to this security vulnerability. And it seems—is that your allegation? No. Okay, because it seems that if they had alerted the public before the patches were available, it would have made your client's data more vulnerable to security risks. No, Your Honor. We're not saying that they should have told people right away. What we're saying is that once the company knew about the exploits, they shouldn't have continued selling. They should have stopped all sales of all of their devices that had these CPUs. Is that your position? Because your briefs continue to say, well, but they continue to sell through Christmas, and so you're saying they should have just completely stopped selling all their CPUs until the patches were available. Is that your position? I don't know that that's so unreasonable. There are some companies who learn about a defect and they stop production. But I'm not saying they should have even stopped production, but they launched new products. They shipped new generations of chips that they also promoted as being secure and as having greater performance during this embargo period. So what's your position then? Any security vulnerability means the product has to be end-of-life until a security patch is developed. Is that it? Any security vulnerability affects the central functioning of the processor. Is that your position then? One that allows cybercriminals to steal data and confidential data, that is security is a central function. Intel advertises that one of its main attributes of its chips is that these are secure and these have top performance. That's what Intel is saying. That there should be, that a company could get to zero risk? I'm sorry, Your Honor, can you? Can a product, can a computer product at this point get to zero risk, zero security breach risk? No. You're arguing they should be aiming for a zero risk? And if it's not zero, then what level is reasonable to market a product and at what point does the security risk become so great that it's unreasonable to expect us to keep using the computer? Well, it isn't zero risk, but when they know about an exploit and they know chips are vulnerable and they're selling these to consumers, hospitals, who are frequently targeted by cybercriminals, who have a duty to protect data, and they're knowingly putting them out there, taking advantage of a period where researchers can't disclose the exploits to the public. Are you making the argument that they withheld patches for sales purposes or that they purposely didn't alert people when their patches were ready because they wanted to sell these things? Is that the argument? There are allegations, Your Honor, that, and these are articles that we cited in the complaint, that researchers said there was a tremendous delay between the time they learned about the vulnerability and the time that they disclosed it. Well, they have to develop the patches. I mean, look, the fact of the matter is, I mean, I just bought a smart TV and it has a computer chip in it, and that was in a stream of commerce. I mean, I looked in the back and the TV had been built in 2020, very early 2023, and I purchased it like six months later, seven months later. As soon as I turned it on, it went through an entire series of updates. I mean, they didn't pull the TV off the market, but obviously there were security problems because I sat there for 30 minutes waiting for all of these four updates that went through this television before I could use it and start to set it up. And these chips are in a stream of commerce. I mean, they go to manufacturers. I mean, I guess, I don't know whether Intel sells chips to ultimate consumers. I mean, I wouldn't buy an Intel chip, but I don't know where you could buy it, but I assume you could, but 99% of their product, I assume, goes to manufacturers of computers and streaming devices and aerospace and everywhere else, and it goes through a stream of commerce, and it takes a long time to get there. And in the meantime, they're developing patches, right? That's correct, but in this situation, Your Honor, they launched new chips and they made them available. What about if they thought, well, yeah, we'll launch the new chips. We know we have them. I mean, they sold me my TV, which I got directly from the manufacturer, but it had problems that were updated. So they sell it and then they give it the patch. If I may just make one remark about the unfair claim. It doesn't have anything to do with central functionality. The question is, were consumers substantially injured? Was it unethical? Was it unscrupulous for Intel to place new products on the market, simultaneously promote that they're secure and that they are top performing and have performance increases of 40% while knowing that these chips have these exploits and will be downgraded substantially? If you don't mind, I'll ask a question. Go ahead, please. On the unfair claim. So my understanding is that you're arguing that we should apply the balancing test? Yes. And the balancing test requires us to ask whether the risk posed by the alleged defect is outweighed by the benefit to the consumer. And it seems to me here that that is, in essence, your whole argument, that Intel made a choice that said the benefits of this design in terms of increased speed and performance far outweigh the theoretical security risk, at least at the time they knew when they made this design decision, which I think was back in the late 90s or early 2000s. And it did literally take many years before anyone even said this is a real, beyond a theoretical risk. So how does that not, under the balancing test, resolve this issue? So we allege that it's not theoretical, first of all. At the time they made this design choice, right, which you are saying created the possibility for these risks, was quite a long time ago. But I'm focusing on the June 2017 period when they knew about the exploits. All right. So even, let's say, when they said, okay, we're going to continue to market this chip with this design and assume that patches can bring down the risk to an acceptable level where it's outweighed by the benefits of this design, why doesn't that address, resolve the balancing test? Well, it's a factual question, Your Honor, whether those risks outweighed having consumers pay for chips that leave them vulnerable and also where they didn't get the benefit of the bargain. For example, one of the clients, Mr. Garcia, paid for an i7 chip, a device with an i7 chip. That chip, that was purchased in November. In February, the patches, after downloading the patches, his computer was crashing, freezing, very slow and sluggish. This is just like three months later. He had all of those problems. He ended up buying another computer later because of the problems with the chip. I think that's the harm that you look at. The harm, is there a substantial harm to the consumer? And what's the benefit to Intel to continuing to put these products on the market knowing that they're subject to the exploit? Your unfair claim is basically that Intel continued to ship and sell CPUs, launching new generations without disclosing the security risk, correct? That they should have told Mr. Garcia and anyone else that, hey, there is this security vulnerability. Isn't that right? That's what I'm hearing. That's what's unscrupulous and unfair about their conduct. Do you agree with that? Well, that they took advantage of the emission market. By not disclosing. So basically, your unfair claim is exactly the same as your emission-based claims. It's all saying they didn't disclose the defect. Well, Your Honor, even if that's the position the court is going to take, Hodgson says that's not the end of the analysis. Just because there's no legal duty to disclose a fact, there's no legal duty to disclose, that's not the end of the inquiry. You apply the balancing test. But then you still have the central function problem, right? Because your claims collapse. But anyway, you've gone five minutes over your time. I'd like to hear from opposing counsel, but I'll give you a minute and see if the panel has more questions. Thank you. Five minutes and 11 seconds over time. May it please the Court. Dan Katz on behalf of Intel. The fundamental problem here is that plaintiffs are attacking common design features of all modern computer chips that were in place for decades before Spectre and Meltdown were discovered. As this Court ruled in the materially identical case against AMD, design features subject to theoretical vulnerabilities are not defects, and reasonable consumers do not expect their devices to be impervious to novel cybersecurity threats. Any other rule would lead to endless defect by hindsight litigation. But you would agree there have to be some security risks that do affect the central function of the processor, and where do we draw that line? How do we draw that line? Well, you can draw the line like in a case like Norcia versus Samsung where the purpose of the product is security and the alleged defect makes the product less secure. Here that's not the case at all. Here there is absolutely no impact on the central function of the computer which is to process. It's not to process free of any security. So what you just said is that only applies to security products. Is it your position that security doesn't matter to the functionality of any product that's not a specific security product? No, I think that it could be possible and a hypothetical for there to be such a great security risk that you might be able to satisfy that test, but here clearly when you're applying the correct test which is incapable of use by any consumer, the risk here certainly doesn't rise to that level. The central functionality of the processor was not impacted. No one can expect just like the Ninth Circuit said in HALC that you'll be impervious to all threats. Here there's never been a reported hack in the wild as a result of any of these vulnerabilities with respect to AMD, Apple, or Intel. Well, she points out that her client in this case apparently downloaded the patches and the patches kept crashing her computer. I'm wondering now the patches aren't actually the processor. The patches are to solidify the security of the processor, but they're not the processor themselves. Well, first of all, the alleged defects, they increase speed. That's this incomplete, undue, and unauthorized access. The performance impact that you're talking about or any impact from the patches... Well, I'm not talking about it. That was her argument. Right, but patches are not physical defects in the computer. That's what the trial court held in the case against Apple. And here, the same allegation was made in HALC and the district court addressed it. As the trial court here correctly said, that there are no allegations that the central functionality was impacted in any meaningful way. If you go back and look at the allegations in the complaint. Well, and that's what the district court said, but now we're here and we're revisiting the decision. So my understanding is, you know, it's not really that the defect has to be the central function, but it has to essentially affect the central function in an unreasonable way. So, for example, the laptop with a smudge in the corner of the screen, that defect doesn't affect the central functioning of the laptop in such an unreasonable way that, you know, that it... But, you know, a monitor defect that essentially makes the monitor unusable means that the laptop is not reasonably usable, even if it's not completely and totally disabled, right? So I think there's somewhere there's a spectrum between a security risk that is so slight that it's within the range of what consumers accept every day that they use a computer, and then there's, I think you acknowledge, there's probably some level of security risk at which it would be unreasonable expect us to keep using the device because the risk would outweigh then the benefits of using that device. Where, I mean, I can also imagine a situation in which to address a security risk, the impact on performance is so great that it's unreasonable to expect consumers to keep purchasing the device. So are you arguing that that's not even theoretically possible? Yeah, as I indicated, I think that a case like Buyer v. Symantec where the entire purpose of the Norton antivirus software is security, and the allegation there was that the defect made the product less secure, where the whole purpose is security, you know, I could see that. That's an easy case, right? I could see that, but in this case, first of all, I go back to the test, right? It's incapable of use by any consumer. That's per Hodgson. And Hodgson cited Collins, a computer chip that corrupts the hard drive, or Rutledge, a laptop screen that goes dark. It effectively, as Collins said, obliterates the function of a computer as a computer. Here, there is no allegation like that. It's really, to us, nonsensical to say that millions of people keep buying Intel devices that have a central functional defect. This case is really a lot like Knowles v. Ares, where modems decreased performance by about 25%, and it was found that there was no central functional defect, even though there was a latency there. In Hauk, the trial court there found that the basic functionality of the processors was not compromised by a 5% to 30% slowdown, and the trial court in Hauk dealt with allegations that there had been some intermittent freezing and crashing, but still said the basic functionality of the computer wasn't impacted. Here, Judge Simon's decision was endorsed very recently by the California Court of Appeals in Nalick v. Seagate Tech that involved a disk drive failure that caused data loss, and the court contrasted that with this case, saying that there was no impact on the central functionality. Counsel, can I ask you a quick question? What about her argument that the updated chip that Intel sold during the relevant period here also had the defect, and that Intel knew that and went ahead and sold it anyway? There was no defect. There was no defect alleged in the case. I mean, we're talking about design decisions. They wanted it to be... Okay, vulnerability, let me use that term. Sure. But the vulnerabilities, right, you're talking about the June 2017 period, and what happened in the case is that, and this is what the trial court addressed on reconsideration. First of all, they abandoned any claim that Intel manipulated the embargo period to make it go longer so that they could sell chips, and the reason why they had to do that is because their own complaint said that there was active involvement of researchers and others in the industry to develop patches, because you don't want the bad guys to get a head start. It's endorsed by the Department of Homeland Security, by governments around the world. There's nothing controversial about that. And then all you're left with during this embargo period is a claim alleging, as I think Your Honor indicated, an omission claim. And there isn't an omission claim because there's no duty to disclose. There's no duty to disclose because there's no central functional defect. There's no exclusive knowledge. There's no materiality. Aren't you stretching Hodson too much? I mean, I agree there is that language that a computer chip that corrupts the hard drive or a laptop screen that goes dark renders those products incapable of use by any consumer, but that's not really the holding in Hodson. That's just sort of an example. Hodson was about chocolate, right? So that's just sort of dicta, right? It's not even a holding. It's just sort of giving an example. And if you look at the cases that found central functionality, it wasn't to the level of rendering the device or the product incapable of use by any consumer, which is what you just stated the test is. Don't you think you're stretching that a bit? Yeah, that's what Hodson said the test is, and I believe the trial court said that's what the test was in Knowles v. Aris. It's what the Ninth Circuit affirmed in Knowles v. Aris, that the test was incapable of use. I think that it rises to... But if you look at the examples where, and I'm sorry to interrupt you, but if you look at the examples where central functionality has been found, it hasn't been to that level of extreme result, right? If an antivirus software makes a computer more vulnerable, where modems can't connect to the Internet reliably, I mean, those are not to the point that nobody can use the device for any purpose. You would agree that there are certainly cases that are not that extreme as incapable of use by any consumer. Right, but Wilson says that California courts reject a broad obligation to disclose. Nalick v. Seagate Tech, a recent case in the Court of Appeals, says that it's quite a rigid standard, and the reason is because California rejects the broad obligation to disclose, so that it has to really, really significantly impact the central functionality. Here, as the trial court held, there is no data corruption, there's no data loss, there's no allegation that the computer stopped functioning in any meaningful way, and the idea that a proof of concept is discovered 20 years and more than a decade after the two design decisions, neither of which has ever been exploited in the wild, no plaintiff alleges that, or that it happened anywhere in the world, so these vulnerabilities clearly don't rise to the level of... But you would agree the Hodson test is the emission was material, the defect was central to the product's function, and at least one of the four Lemandry factors applies. Correct. Nowhere in there do I hear that the product has to be completely incapable of use by any consumer. You would agree, right? That's not how anyone discusses the Hodson test, that that is one of the requirements, that the product has to be completely incapable of use by any consumer. The central functional defect test, I mean, it's cited in Knowles v. Aris, in the trial court in the Ninth Circuit, that Hodson sets out a test for a consumer product as rendering it incapable of use by a consumer, that picking up on Collins, that it obliterates the function of the computer. A laptop that has a screen that doesn't work, so you'd have to attach another screen you can't really use as a laptop. In this case, all the people, the millions of people that bought computers before the vulnerabilities were discovered, they got full functionality out of them, and then people who bought computers and that there's a patch applied, their use of the computer is not impacted in any meaningful way, just like the trial court held in Houck that the basic functionality is in compromise. So whether or not Judge Simon actually applied a lesser test, he didn't apply incapable of use, he applied the test of central and important to the product's function. So even applying the most limited test, it wasn't met here by the plaintiffs, because the Houck court, I think, quite rightly held that reasonable consumers don't expect devices impervious to novel cybersecurity threats. So the idea that any time Microsoft has a patch Tuesday, I think Your Honor referred to that there are patches constantly in iPhones, iOS updates. I think that anybody could take judicial notice of the fact that has any type of computer, consumer electronic, iPhone, Android phone, any kind, pixel, that there's patches, because that's the way it is in this world of hackers and governments that try to exploit. I mean, this court, this court and the district courts in the Ninth Circuit all through the federal system are locked down like crazy, but that doesn't mean that we don't have to have security enhancements. Right, and I'd refer the court to SCR 81. Using the standard coordinated vulnerability disclosure system, over 10,000 new vulnerabilities are identified every year, and the fact that a manufacturer does the responsible thing and addresses the vulnerabilities by developing patches doesn't create liability. I'd also point out that there's really no material distinction between the facts of this case and the facts of the cases against AMD and Apple. Can I ask you a question about the exclusive knowledge? Why shouldn't that exclusive knowledge be vis-a-vis the plaintiffs? I'm sorry? The exclusive knowledge requirement for the duty to disclose under Lemandry, why shouldn't that exclusive knowledge be Intel had exclusive knowledge relative to the plaintiffs? Are you talking about just during the embargo period or in general? I'm talking about you argue that Intel, plaintiffs would have had to argue that Intel had the sole knowledge of the defects, and I guess with the California Supreme Court case, Goodman versus Kennedy, which says that it can be when one party to a transaction has superior knowledge to the other party. Why wouldn't that apply here, and why haven't plaintiffs alleged enough to show that vis-a-vis consumers, Intel had superior knowledge? Because I think that the test is exclusive knowledge. Hosdin said that exclusive is the better reading of California law. In the Goodman versus Kennedy case, that involved an attorney that handled a stock registration, and the allegation was the attorney gave bad advice to the client, so third-party purchasers sued, and the California Supreme Court said that that attorney did not have exclusive knowledge vis-a-vis the third-party purchasers. That attorney clearly had superior knowledge over the third-party purchasers, but again, the California Supreme Court was setting a high standard that Hosdin endorsed by saying that it's exclusive, not superior. I'd also say to the Court that with regard to a superior knowledge standard, that would totally collapse the LeMandry factors, because the manufacturer is always going to have knowledge that's superior to a consumer about the product. It would basically eliminate LeMandry because it would always be met when you're talking about design. Wilson indicated that superior isn't the test, either when you're talking about the exclusive knowledge test because it would always be satisfied, and I think the same is the case here. Here, though, we point out, and Judge Simon found, that all over the complaint, the plaintiffs allege tremendous public knowledge about the designs that plaintiffs say are the root of their case, that the designs were discussed in publications, in patent applications, in intel manuals, in white papers. So these designs were disclosed publicly, and the trial court noted the flip side of that, which is that those publications were the only evidence cited of intel's knowledge of these alleged design defects, so if those publications didn't disclose any defect, then that factor fails also because that just shows that intel didn't have knowledge of the defect, which was the Holding and the Howe case, where the plaintiffs likewise tried to rely on many of the same publications, including relying heavily on a paper by Dr. Ruby Lee of Princeton University. That's another way that the cases match up, but I think that the standard has to be exclusive, like Hodgson said, like Goodman v. Kennedy said. All right, thank you. You're 2 minutes and 20 seconds over your time. Oh, do you have a question? Go ahead, please. Sorry. I'm going to ask one more question because I do want to go back to checking out what is the right test for central functionality. As you noted, Judge Simon said it could be this extreme version of the test where it has to render the product completely unusable, but it might not be. It could be something softer. It could be some kind of significant impact, but even under that lesser test, I'm going to find it was not. The defect doesn't relate to the central function, and I'm just trying to make sure I understand, and maybe we don't need to resolve this because you say you win either way, but when I go back to the underlying California cases, there's a lot of discussion about California's warranty law and saying that unless there was a warranty, something that just affects the quality of the product or the life of the product outside of the warranty period, that's not going to be something that is actionable, and we're not going to consider that a defect that goes to the central function. Is that the best argument for it? Unless it affects warranty and unless it renders the product completely unusable, then it's just not something that California law recognizes as a defect that needs to be disclosed. Well, that's an important principle embedded in California law. In the Barden case, it dismissed an unfair design claim because there was no actionable misrepresentation. Physical safety hazard or breach of warranty. And that picks up on the Doherty case that if you don't have that standard, it effectively eviscerates the line between strict product liability law and consumer protection law because warranties become perpetual. Any consumer can come in and try to challenge a design decision, like in this case how all the manufacturers, not only Intel but Apple and AMD, balanced security and speed. And Barden says that there is no such thing as an unfair design claim. And you heard about the balancing test. Well, Barden resolved it as a matter of law, that there was nothing unfair about that. This court resolved it as a matter of law in the Howe case, saying that there was nothing unfair because there was no plausible allegation that the harm from a theoretical cybersecurity flaw that hasn't been successfully exploited outweighs the other benefits of AMD's processor design. And the same goes for Intel, which delivered those performance benefits to consumers for years and years before even a proof of concept was discovered by a researcher in a lab. So for all of those reasons, we would respectfully request that the court affirm. Thank you, Mr. Katz. All right, thank you. All right, let me ask my colleagues, would two minutes be sufficient, you think? Okay, Srinivas, two minutes, would that be sufficient? Oh, sure. All right, you'll have two minutes. Go ahead, please. Thank you, Your Honors. On the unfair claim, I think the court should look at, well, what's plaintiff's theory? Not do the facts overlap. What is their theory? And plaintiff's theory here is that it was unfair to knowingly place chips into the marketplace that it knew were susceptible to these exploits. And these exploits, Spectre and Meltdown, they were unprecedented. There's generally not these types of vulnerabilities with hardware. It's usually software updates and software problems. But these vulnerabilities were unprecedented. That's why it made so much news. There's been hundreds of articles written about this. So this is a significant security risk. And the question is, was our theory, it's unfair to put these chips into the marketplace? We cite cases, for Your Honors, that that's an unfair business practice. There's your contention that Intel should have just stopped selling these types of chips altogether, that you should have gone back to a design without the predictive, I forget the exact terminology, without the design, physical design, that creates these vulnerabilities? Well, that's a question of fact, Your Honor. And I'll quote from the Hovarth decision because it directly answers Your Honor's question. The court concludes the alleged harm of plaintiff outweighs any purported benefit to LG Electronics and reasonable alternatives were available to placing allegedly defective G2X phones in the stream of commerce. So we don't know at this stage what alternative measures there were to simply selling them and launching a new chip and simultaneously promoting them as secure and as providing greater performance when there was an embargo period and consumers wouldn't have that information to know. Or you should at least get past the dismissal stage? Yes, Your Honor, it's a factually intensive question. Unless the court has any more questions, I'll complete my argument and ask that the court reverse the district court below. Thank you. Thank you all very much. Thank you for the very helpful arguments. We are adjourned. All rise.
judges: KOH, SUNG, Ezra